# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 19 2015

JULIA C. DUDLEY, CLERK
BY: A. Blaylock
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 1:15mj38
INFORMATION ASSOCIATED WITH )
Sinofrank12@gmail.com; jiejiexuli@gmail.com; )
20140314lee@gmail.com; and nutripowder@gmail.com )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
INFORMATION ASSOCIATED WITH Sinofrank12@gmail.com; jiejiexuli@gmail.com; 20140314lee@gmail.com; and nutripowder@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. (more fully described in Attachment A)

located in the      Northern       District of      California      , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 331 and 952; | Misbranding of a Drug, Illegal Importation of Controlled Substances, and |
| 18 U.S.C. § 545 | Smuggling |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Timothy R. Royster, Special Agent, FDA-OCI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/19/15

*Judge's signature*

City and state: Abingdon, Virginia          Hon. Pamela Meade Sargent, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
sinofrank12@gmail.com; jiejiexuli@gmail.com,
201403l4lee@gmail.com and nutripowder@gmail.com
THAT IS STORED AT PREMISES CONTROLLED
BY GOOGLE, INC.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Timothy R. Royster, hereafter "Affiant", being first duly sworn state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at the premises owned, maintained, controlled or operated by Google, Inc., an email provider headquartered at 1600 Amphitheater Parkway, Mountainview, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. Your affiant is a Special Agent (SA) with the U.S. Food and Drug Administration (FDA), Office of Criminal Investigations (OCI), assigned to the Metro Washington Field Office, Norfolk Division, Norfolk, VA. As such, I am authorized to conduct criminal investigations, make arrests and execute search and arrest warrants for offenses in violation of statutes found in the United States Code, specifically Title 21 and Title 18. I have been a federal law enforcement officer since December 1987, and previously employed as a SA with the Office of Inspector General,

Office of Investigations, U.S. Department of State and the Coast Guard Investigative Service, Office of Homeland Security.

3. My duties as a SA of the FDA/OCI include the investigation of alleged crimes, including offenses involving the manufacture and sale of product that could be harmful to humans if ingested, to include dietary supplements that contain steroids or other related synthetic chemicals or precursors.

4. The facts in this affidavit come from my personal observations, my training and experience and information obtained from witnesses and other agents, hereinafter referred to as the "investigative team". This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Eric LI and other unknown persons were involved in the importation of controlled substances and smuggling of contraband for use in the manufacture and sale of misbranded and unapproved dietary supplements in violation of Title 21, U.S.C. §§ 952 and 331 and Title 18, U.S.C. § 545.

6. This investigation was initiated in or around September 2011, after it was learned that a large manufacturer and distributor of dietary supplements in the United States was allegedly importing controlled substances and pro-hormone powder, a new generation of steroids not specifically listed as anabolic steroids under the Controlled Substances Act, and encapsulating these powders for sale as "dietary supplements". The source of these powders was ultimately identified as Sino Bio-Tech Company, Ltd, Shanghai, China, established by an individual identified as Eric LI an alleged to be a leading manufacturer and supplier of natural raw ingredients for pharmaceuticals and chemicals.

7. A search warrant search yielded numerous items to include documents, pills and pill bottles labeled as "dietary supplements", computers and packages of white powder bearing labels indicating they originated from China, specifically Sino Bio-Tech Company. The owner of the

dietary supplement manufacturer, hereinafter referred to as "cooperating individual", admitted that for several years he/she conducted numerous on-line transactions and communicated directly with Eric LI and, to a lesser degree, Frank LNU, via electronic mail, specifically utilizing the following email addresses: Sinofrank12@gmail.com; jiejiexuli@gmail.com; 20140314lee@gmail.com; and nutripowder@gmail.com.

Sinofrank12@gmail.com

8. In 2011, the cooperating individual confirmed that he/she largely communicated on-line with Eric LI and Frank LNU via their email address, sinofrank12@gmail.com. As an example, this email address was used by the cooperating individual to order an array of powders which were delivered just prior to the execution of the search warrant. Among the many packages seized, there were a total of 24 packages which contained a handwritten notation on the outside foil, "2011-414", this notation identified the type of powder inside the package. In this case, the powder was Turanibol, a schedule III anabolic steroid. The approximate collective weight of these shipments totaled 53 kilograms (106 pounds).

9. The cooperating individual instructed Eric LI to send these shipments of powder from China to a UPS Store at 1818 Martin Luther King Jr. Boulevard, Chapel Hills, NC. Employees were directed to drive to the UPS Store in North Carolina and pick up these packages which were then transported to the cooperating individual's warehouse located in Danville, VA. The importation of a scheduled drug is a violation of Title 21, U.S.C. § 952 and the manufacture and distribution of same is a violation of Title 21, U.S.C. §841

10. Each of these 24 shipments were falsely manifested given the "Name and Description of Contents" section on the common carrier air waybill listed the powder as "sample", "mannitol", "reservatrol" or other bogus identifier. Further, the "Declared Value" section of the goods were falsified in that Eric LI disclosed the value as "USD 15" or "10.00 USD" or other similar amount

when in fact both parties were aware that the true value of each shipment totaled a minimum of $2,000. Whoever knowingly and willfully imports merchandise containing a false or fraudulent invoice into U.S. commerce is in violation of Title 18, U.S.C. §545.

11. Of the noted 24 shipments of Turanibol powder, samples were removed from three packages and sent to FDA's Forensic Chemistry Center to confirm the identity of the powder and to perform a quantitative analysis on each sample. Subsequently, the Forensic Chemistry Center confirmed that each sample contained Turanibol and the quantitative analysis provided the following results: 983 milligrams per gram (98.3% pure); 957 milligrams per gram (95.7% pure); and 940 milligrams per gram (94% pure).

12. The cooperating individual confirmed that other types of powders were similarly ordered on-line from China to include numerous kilograms of a powder identified as Superdrol, aka Methasterone. In 2006, FDA announced that Methasterone was considered a "synthetic steroid" and thus the sale of any dietary supplement containing this active ingredient was a violation of the Federal Food, Drug and Cosmetic Act. The cooperating individual acknowledged that in January 2011, he/she was aware that the sale of any dietary supplement containing this powder was a violation of federal law; nonetheless he/she continued use the email address, sinofrank12@gmail.com during this period to import and sell products containing Superdrol.

13. On December 5, 2012, this office submitted a "Request for Preservation of Records" pertaining to the preservation of all stored communications that were sent and received by/from the Google email account, sinofrank12@gmail.com.

jiejiexuli@gmail.com

14. On May 28, 2013, the investigative team opened a Hushmail email account to covertly communicate with Eric LI in order to place orders for the undercover purchases of illegal powder.

After contacting Eric LI with the updated undercover Hushmail email address, he responded with pricing of several powders but used a different email address, jiejiexuli@gmail.com.

15. On July 1, 2013, the investigative team contacted Eric LI at jiejiexuli@gmail.com and ordered one kilogram of synthetic steroid powder identified as Methylstenbolone (2,17a-methyl-5a-androsta-1-en-17b-ol-3-one), and one kilogram of Epistane (2a,3a-epithio-17a-methyl-5a-androstan-17b-ol). Subsequently, Eric LI responded to confirm the order which was valued at $14,000.

16. On 7/30/2013, Eric LI sent an email wherein he stated "to lower the shipping risk for the first trial order, this time, our shipping staff ship them out in separate shipments: 500g new compound of 2,17a, shipped by post, EMS and the tracking # is EE839376275CN. The label is L-Carmitine L-Tartrate 500g sample . . . Another 500g 2a,17a, has been picked out by post, tracking # is EE736601111CN . . . and if the first shipment is delivered, our people advise me the last 1kg shipment of 2a,3a will be shipped out right away." Eric LI communicated via the email address, jiejiexuli@gmail.com.

17. On August 2, 2013, an express mail package bearing tracking number EE839376275CN was received by the investigative team and a sample was submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed that the sample contained the presence of Methylstenbolone, a new and potent pro-hormone recently brought into the market to build muscle mass and size gain.

18. On August 21, 2013, Eric LI, using the email address jiejiexuli@gmail.com, confirmed that the shipment of Epistane, bearing tracking number EE985869205CN, would soon be arriving into the U.S.

19. On August 23, 2013, an express mail package bearing tracking number EE985869205CN was received by the investigative team and a sample was submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed that the sample contained the presence of

desoxymethyltestosterone (Madol), a Schedule III steroid powder, two other components were observed but not identified.

20. On August 23, 2013, an express mail package bearing tracking number EE736601111CN was received by the investigative team and a sample was submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed that the sample contained the presence of Methasterone, a Schedule III steroid powder and two other components which could not be identified with the techniques used.

21. On November 20, 2013, the investigative team contacted Eric LI using the email address, jiejiexuli@gmail.com, and placed another order for several types of raw steroid powder compounds. Subsequently, Eric LI responded to confirm that the order totaling $7,250 would be shipped to the U.S.

22. On December 11, 2013, Eric LI sent an email to the undercover investigative team using his email address, jiejiexuli@gmail.com, to advise in part " . . . Another kg of ATD have been sent out to the following address and the tracking # is EE8393758CN. Delivered 0.5kg DMZ have been sent out today and the tracking # is EE839375791CN."

23. On December 12, 2013, an express mail package bearing tracking number EE839375828CN was received by the investigative team and a sample was removed and submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed the presence of androstatrienedione, a synthetic pro-hormone powder.

24. On December 19, 2013, an express mail package bearing tracking number EE839375791CN was received by the investigative team and a sample was removed and submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed the presence of Methasterone, a Schedule III steroid, and Dimethazine, a synthetic pro-hormone powder.

25. On December 19, 2013, Eric LI, jiejiexuli@gmail.com, sent an email to the undercover Hushmail account to advise that "1 kilo of 19-Nora have been sent out and the tracking # is EE839375709CN.

26. On February 7, 2014, an express mail package bearing tracking number EE839375709CN was received by the investigative team and a sample was removed and submitted to the Forensic Chemistry Center for analysis. The laboratory confirmed the presence of 4,9(10)-estradien-3 17-dione, a schedule III steroid powder (also called 4,9-estradien-3, 17 dione and 19-Nor-4,9(10)-androstadienedione.)

27. Each package was shipped from China to the cooperating individual located in Danville, VA.

28. On November 20, 2014, this office submitted a "Request for Preservation of Records" pertaining to the preservation of all stored communications that were sent and received by/from Google email account jiejiexuli@gmail.com.

20140314lee@gmail.com

29. On June 6, 2014, the investigative team forwarded an email to Eric LI stating in part "I worry a lot more about getting the materials through customs than I do selling them because a package being stopped by customs is what caused all the crap a few years ago." The investigative team added a request to purchase several kilograms of Dimethazine and Epistane.

30. On June 9, 2014, Eric LI responded using a different email address, 20140314lee@gmail.com, wherein he stated " . . . and for your concern for shipping risks, especially for customs through, I just have a idea to share with you, let's see if it is workable, how about we ship them out together with other materials, like, L-glutamine, L-carnitine, creatine HCL or mono, which are your regular demands each month, using these for covering, and we put these phs [pro-hormones] in the bottom of the drums . . . after delivery you can take them out." The investigative team determined that this communication was Eric LI's introduction to have the powders smuggled into the U.S. by placing the illegal powders at the bottom of drums that could then be covered by legal protein powders or other benign products.

31. On July 2, 2014, Eric LI responded to the undercover Hushmail account regarding the upcoming shipment of Epistane and Dimethazine, "I wish to ship it by sea shipment with covered by other commodity, like L-flutamine, creatine mono, creatine HCL, L-arine AKG, carnitines, etc., we prefer 1000kg quantity, the more volume, the lower risks and I know you may ask your contract manufacturers to purchase some ingredients for you, but I advise you can choose one or two bigger volume products for covering these compounds ship to you and we have done this way before, which is safest way to get through customs."

32. On July 17, 2014, a wire transfer totaling $17,000 was sent to Eric LI's bank in Shanghai, China, for the undercover purchase of two kilograms of Epistane and two kilograms of Dimethazine. Using his email address, 201403141ee@gmail.com, Eric LI subsequently communicated with the undercover Hushmail account to advise the package was on the way and falsely manifested as "creatine mono, after receive it, pls open the drum, on the top of the drum is creatine mono, 2kilo DMZ and 2kilo Epi are at the bottom of the drum."

33. The investigative team opened the package which weighed approximately 50 pounds and secreted at the bottom were two wrapped packages allegedly containing Epistane and Dimethazine.

34. The package was shipped from China to the cooperating individual located in Danville, VA.

35. On October 31, 2014, the investigative team contacted Eric LI at 201403141ee@gmail.com requesting to purchase several kilograms of Superdrol, a Schedule III steroid. On the same day, Eric LI responded "yes, shipment by sea is very good, it is the safest shipping way, and there iis not any record in the customs . . . if you need superdrol we can arrange a separate sea shipment directly to your warehouse, so we need a consignee in the US."

36. On November 20, 2014, this office submitted a "Request for Preservation of Records" pertaining to the preservation of all stored communications that were sent and received by/from the Google email account, 201403141ee@gmail.com.

37. On November 6, 2014, Eric LI sent an email to the undercover Hushmail account to advise he was changing email addresses, he stated "I sent the price use my another mail box, have you received it?"

38. On November 8, 2014, Eric LI sent an email to the undercover Hushmail account using the email address, nutripowder@gmail.com, wherein he stated "sorry I'm late, this is Eric. The superdrol price is $2,350kg".

39. On November 11, 2014, Eric LI continued to use the email address, nutripowder@gmail.com, to provide instructions regarding the next shipment which was going to be two kilograms of Superdrol, he states "we will ship some amino acids and herbs to US together with Superdrol, we will put Super in the bottom of the drum, so this will be covered well and safe shipping. The sea shipment will ship to you directly. It will have no customs clearing risks."

40. On November 12, 2014, the investigative team forwarded an email to Eric LI, nutripowder@gmail.com, to ask how much regular powder or creatine monohydrate (a legal substance), would be needed to cover the packages of Superdrol. Eric LI responds "I think the better is 1000kg or 2000kg because this volume can cover 2kg or more of Superdrol very easy".

41. On November 14, 2014, using email address nutripowder@gmail.copm, Eric LI changes the delivery method and advised ". . . we can do express to deliver superdrol for you, we found out a very good express shipping agency. They have a strong ability all the packages can through customs well. If you want we can try 1 or 2 kilos."

42. The investigative team responded to the same email address, nutripowder@gmail.com, and asked "is this the correct email to use for now or does it matter?" Subsequently, Eric LI responded and it was noticed that he had reverted back to his previous email account, 20140314lee@gmail.com. This shipment is subsequently sent to the investigative team and when opened, the alleged two

kilograms of Superdrol powder were found secreted in a drum beneath approximately 50 pounds of creatine monohydrate.

43. The package was shipped from China to the cooperating individual located in Danville, VA.

44. On November 20, 2014, this office submitted a "Request for Preservation of Records" pertaining to the preservation of all stored communications that were sent and received by/from the Google email account, nutripowder@gmail.com.

45. Based on the facts that are stated in this document, your affiant submits that there is probable cause to believe that the evidence of a pattern and practice of smuggling and illegal importation of controlled substances and other contraband can be located within the stated email accounts.

46. In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the general public. Google, Inc. allows subscribers to obtain email accounts at the domain name "gmail.com", like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc., are likely to contain stored electronic communications (including retrieved and non-retrieved email for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, email transaction information and account application information.

47. In general, an e-mail that is sent to a Google, Inc., subscriber is stored in the subscriber's "mail box" on Google, Inc. servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google, Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google, Inc. servers for a certain period of time.

48. When the subscriber sends an e-mail, it is initiated at the user's computer and transferred via the Internet to the Google, Inc. servers and then transmitted to its end destination. Google, Inc., often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail

from the Google, Inc. server, the email can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on Google, Inc. servers for a certain period of time.

49. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google, Inc., but may not include all of these categories of data.

50. A Google, Inc. subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures and other files, on servers maintained and/or owned by Google, Inc.

51. Subscribers to Google, Inc. might not store on their home computers copies of the e-mails stored in their Google, Inc. account. This is particularly true when they access their Google, Inc. account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

52. In general, e-mail providers like Google, Inc. ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

53. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e. session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google, Inc. website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects

to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

54. In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

55. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account and attachments to e-mails, including pictures and files.

## INFORMATION TO BE SEARCH AND THINGS TO BE SEIZED

56. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized person will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

57. Based on the foregoing, I request that the Court issue the proposed search warrant.

58. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated " 18 U.S.C. § 2711(3)(A)(i).

59. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

60. .I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. The target of this investigation, Eric LI, is a Chinese national who visits the United States two or three time per year to conduct business. If alerted that he is the target of a federal investigation, it would be very likely that he would never return to the United States and thus negatively affect the final outcome of this case. Further, the information within this affidavit pertains to an ongoing criminal investigation that is neither public nor known to those being targeted. Based on the aforementioned, it is believed there is good cause to seal these documents because their premature disclosure may seriously jeopardize the entire investigation.

Timothy R. Royster
Special Agent
U.S. Food and Drug Administration
Office of Criminal Investigations

SUBSCRIBED and SWORN
Before me this 19th of March 2015.

UNITED STATES MAGISTRATE JUDGE

FILED UNDER SEAL PURSUANT TO THE E-GOVERNMENT ACT OF 2002

## ATTACHMENT A

**Property to be Search**

This warrant applies to information associated with sinofrank12@gmail.com; jiejiexuli@gmail.com, 20140314lee@gmail.com and nutripowder@gmail.com that is stored at premises owned, maintained, controlled or operated by Google, Inc., a company headquartered at 1600 Amphitheater Parkway, Mountainview, California 94043.

FILED UNDER SEAL PURSUANT TO THE E-GOVERNMENT ACT OF 2002

## ATTACHMENT B

I. **Service of Warrant and Copying of Files and Information by Google, Inc.**

As authorized by Title 18, United States Code, Section 2703(g), the following procedures shall govern the service and execution of this warrant:

A. The officer executing this warrant shall effect service by any lawful method, including faxing the warrant (with Google's consent) to Google's offices at the location specified in the warrant.

B. The officer executing this warrant shall permit Google, as custodian of the computer files described in Section II below, to locate the files, copy them onto removable electronic storage media or print them out as paper copies, and deliver the copies to the officer, who need not be present during this process, at the location specific in the warrant.

II. **Files and Information to be Copied and Delivered by Google, Inc.**

A. Any and all information for the email accounts sinofrank12@gmail.com, jiejiexuli@gmail.com, 20140314lee@gmail.com, and nutripowder@gmail.com (hereinafter the "SUBJECT ACCOUNTS"), including but not limited to all subscriber information, such as name and address, date of birth, gender, telephone numbers, screen names/nicknames/identities, date account created, account status, alternate email address, registration from IP, date IP registered account history, subscriber complaints and communications with Google, log-in IP addresses associated with session times and dates and a listing of Google services, and/or properties used.

B. For the subscriber(s) identified in Paragraph A above, the contents of any and all emails and email communications stored in the subscriber's Gmail account, including received messages, sent messages, deleted messages, messages maintained in trash and other folders, and any files and attachments to any such messages;

C. For the subscriber(s) identified in paragraph A above, the contents of any and all electronic files (including but not limited to images and videos) that the subscriber(s) has stored in the subscriber's Google account, or in any other services or properties associated with such Google account;

D. For the subscriber(s) identified in Paragraph A above, any and all other content associated with the account, including but not limited to images, videos, and electronic files;

E. For the subscriber(s) identified in Paragraph A above, any and all billing records and methods of payment provided by the subscriber to Google for any services; of any "favorite places", bookmarked web sites, address books, "buddy lists," subscriber profiles and subscriber privacy and account preferences; and

F. For the subscriber(s) identified in Paragraph A above, any personal web space and web pages, including posted images and associated links that were created or maintained by the subscriber.

III. **Information to be Seized by Law Enforcement Personnel**

The following items are to be seized as evidence, fruits and instrumentalities of the violation of Title 18, United States Code, §545 and Title 21, United States Code, §§ 331 and 952:

A. Customer or subscriber account information for the SUBJECT ACCOUNTS, including but not limited to information about such account on all Google services, including but not limited to Gmail, Google Apps, Picasa and Google Checkout, from January 2010 through and including the date of execution of this warrant:

1. Name(s) and associated e-mail addresses;
2. Physical address(es) and location information;
3. Records of session times and duration;
4. Length of service (including start date) and types of service utilized;

5. Telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address;

6. The means and source of payment for such service (including any credit card or bank account number);

7. Identity of Gmail user that provided invitation to subscriber to obtain a G-mail account;

8. Identities of individuals who received invitations from subscriber to obtain a G-mail account;

9. Internet Protocol addresses used to register the account or otherwise initiate service;

10. Contact lists, address books, affiliations, message board usage, and chat room nicknames;

11. Any personal web space; and

12. Any search queries or cookies accumulated as a result of the use of any Google Service.

B. User connection logs and communications for the SUBJECT ACCOUNTS on all Google Services, including but not limited to Gmail, Google Applications and Google Checkout, from January 2010 through and including the date of the execution of this search warrant, for any connections to or from the SUBJECT ACCOUNTS,

User connection logs should contain the following:

1. Connection of time and date;

2. Disconnect time and date;

3. Method of connection to system (e.g., SLIP, PPP, Shell);

4. Data transfer volume (e.g., bytes);

5. The IP addresses that were used when the user connected to the service;

6. Connection information for other systems to which user connected via the SUBJECT ACCOUNTS, including:

a. Connection destination;

   b. Connection time and date;

   c. Disconnect time and date;

   d. Method of connection to system (e.g. telnet, ftp, http)

   e. Data transfer volume (e.g. bytes); and

   f. Any other relevant routing information (e.g. forwarding addresses)

7. Source or destination of any wire or electronic mail messages sent from or received by the SUBJECT ACCOUNTS, and the date, time and length of the message; and

8. Any address to which the wire or electronic mail was or is to be forwarded from the SUBJECT ACCOUNTS:

Records and communications in the SUBJECT ACCOUNTS, including the contents of any wire and electronic communications, including attachments, stored files, and archived chat logs, for the period of activation of the SUBJECT ACCOUNTS through and including the date of execution of this warrant, pertaining in any way to:

1. The manufacture, sale, distribution, dispensing importation, smuggling of controlled substance or other contraband.

2. The use of communication facilities in furtherance of the above described offenses.

3. The laundering of monetary instruments in furtherance of the above described offenses;

4. The identification of other computers and web sites that have been used in the commission of the above described offenses.

5. The sale, distribution, exchange or other disposition of any controlled substance or other contraband, including but not limited to, sales records, advertising records, shipping records, records of customer communication and correspondence and any records of complaint about items purchased.

6. The identification of purchasers of controlled substances or other contraband.

7. All financial records, documents, and materials identifying expenditures made in furtherance of and/or documenting the receipt and disposition of proceeds from the above described offenses including but not limited to banking, investment and financial account information.

8. The identification and location of persons, entities and instrumentalities involved in the activities described in paragraph C (1-7) above.